IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DONALD THOMAS WRIGHT,                    )
                                         )  No. CV-06-2798 RHW JPH
            Petitioner,                  )
                                         )  REPORT AND RECOMMENDATION TO
    v.                                   )  DENY WRIT OF HABEAS CORPUS
                                         )
JAMES A. YATES,                          )
                                         )
            Respondent.                  )
                                         )
                                         )
_____  )

   **BEFORE THE COURT** is a Petition under 28 U.S.C. § 2254 for
Writ of Habeas Corpus by a person in state custody (Ct. Rec. 1)
and Respondent's Answer and Memorandum of Authorities (Ct. Rec.
12).  Petitioner appears pro se and Respondent is represented by
Deputy Attorney General Patrick J. Whalen.  This matter was heard
without oral argument.  After careful review and consideration of
the pleadings submitted, it is recommended that the Petition for
Writ of Habeas Corpus be **denied**.

   At the time his petition was filed, Petitioner was in custody
in Soledad, California, pursuant to his 2001 Sacramento County
conviction for second degree murder, assault with a firearm, and
firearm enhancements.  (Ct Rec. 1 at p. 1.)  Petitioner challenges

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 1 -

PDF created with pdfFactory trial version www.pdffactory.com

1  2001 Sacramento County convictions.  (Ct. Rec. 1.)

2  **I. BACKGROUND**

3  **A. Factual History**

4      The California Supreme Court described the facts:

5      *A. The Prosecution Case*

6      Eddie and Laura Sanchez and their children moved next
       door to defendant in April 1996.  In the early morning
7      hours of November 15, 1999, defendant visited the Sanchez
       home, shot and killed Eddie, and then wounded Clarence
8      Redoble, a friend of defendant's who had accompanied him.
       Eddie had been urging defendant out the door, when
9      defendant pulled out a Kimber .45 pistol, loaded with
       Black Talon hollow-point bullets, and fired, while
10     members of the Sanchez family sat in the living room
       watching a movie.  According to witness accounts, no
11     argument or threatening conduct preceded the shooting.

12     The previous day, the Sanchez family had hosted a barbecue.
       They dug a fire pit in the back yard. Two of Eddie's
13     brothers, John and Anthony, their families, and Laura's
       younger sister, Tracey, were at the house. This
14     was not unusual. The families were close-knit. Family
       members visited often and frequently stayed overnight.
15     About a month before the shooting, Anthony was sleeping on
       the couch at Eddie's house, when he was awakened by
16     defendant knocking on the door. Defendant told Anthony
       someone was trying to burglarize Eddie's car, and then he
17     said, "Don't worry, I got something for them," showing
       Anthony a gun he had tucked in his waistband. Anthony's
18     impression was that defendant "was a little off" and "kind of
       odd."

19
       Clarence Redoble, defendant's friend, lived five minutes away
20     from defendant, and, as he often did, he saw defendant
       several times on November 14, the day before
21     the shooting.  That morning, at defendant's insistence,
       he brought his pit bulls over to defendant's house and
22     released them in the crawl space under the house as a
       security precaution. Defendant thought people were trying
23     to gain access to his house by tunneling their way into
       the crawl space. Redoble went back later to feed the dogs and
24     turned them loose in the backyard.

25     By nightfall on November 14, the weather had turned cold
       and rainy. The Sanchez family rented three videos and
26     went inside for a dinner of hot soup and a movie
       marathon. Some family members watched the movies; others fell
27     asleep. Most of the children were put to bed.

28
       REPORT AND RECOMMENDATION TO DENY
       WRIT OF HABEAS CORPUS
       - 2 -

PDF created with pdfFactory trial version www.pdffactory.com

Sometime after 11:00 p.m., defendant called the Sanchez house; Laura's sister Tracey answered the phone. Defendant said he needed to talk to a friend and wanted Tracey to come over. She refused. Defendant asked to speak to Eddie, but Tracey told him Eddie was asleep and then hung up the phone.

Around midnight, Clarence Redoble returned to defendant's house and found him standing outside in the rain. Defendant said he had locked himself out of the house. It was cold, and Redoble had tucked his hands into his jacket pockets, but defendant asked Redoble to take his hands out of his pockets, which made Redoble think defendant was "tripping." Redoble checked the doors and windows to see if there was any way to get into the locked house. Finally, he suggested breaking a small window in the side door, which he could easily repair the next day. Defendant rejected that idea. He wanted to go to Eddie's house to call a locksmith. Redoble thought ut was too late to disturb the neighbors, so he offered to go to his own house to call a locksmith. Defendant was adamant. As an alternative, Redoble offered to go next door alone and ask the Sanchezes to call a locksmith so that defendant, who used crutches, would not have to negotiate the path on his crutches in the rain. Defendant stubbornly followed Redoble to Sanchez's door.

Eddie answered Clarence Redoble's knock and invited him and defendant inside. Defendant refused to sit down and remained standing just inside the door, resting on his crutches, while Eddie looked up locksmiths in the telephone book and made couple of calls.

Defendant's behavior was unusual. According to witnesses, he was mumbling to himself, pointing to different people, saying, "Oh, there's one . . . by the window. Oh, [that]'s her." Clarence Redoble wanted to leave, but defendant resisted. He asked to go to the backyard to see Eddie's dogs. Eddie refused, explaining it was so cold and raining outside and defendant was on crutches. Defendant then started to get aggressive, demanding to see the backyard. Eddie sought to soothe defendant's agitation, telling him, "no one's gonna hurt you here."

At some point during this exchange, Eddie went into the kitchen and put a barbecue fork in his back pocket. Eddie's brother John saw him do so and expressed concern. Eddie said: "Everything's okay. Don't worry about it." Defendant was wearing a jacket, and he kept putting his hand in the jacket pocket, which had a noticeable bulge.

The front door had been opened and cold air was seeping into the house. Eddie asked defendant to leave, telling him the baby would get sick because of the cold air coming in through

PDF created with pdfFactory trial version www.pdffactory.com

the open door. Defendant refused, saying, "No, I don't wanna go." He seemed to get upset, and he asked Eddie, "Are you packing?" Eddie answered, "No, what do I need a gun for?" and then asked, "Why? Does he have a gun?" Eddie was standing next to defendant. He patted or frisked defendant's jacket and then stepped back a little. Eddie had nothing in his hands. He never touched the fork in his back pocket. Defendant pulled the pistol from his jacket and fired several shots at Eddie. Clarence Redoble was holding defendant's arm, and when he tried to pull defendant away, defendant turned the gun toward Redoble and fired a shot that grazed Redoble's hip.

Eddie was flung backward by the blast. His body was sprawled on the on the dining room floor. One of the Black Talon hollow-point bullets, with which defendant had loaded the gun, had lacerated two major blood vessels in Eddie's lower abdomen. After the shooting, Eddie's brother Anthony was the first person to reach defendant, who was standing right outside the door, the gun still in his hand. Defendant turned the gun toward Anthony, but Anthony launched himself at defendant, grabbed his gun hand, and bashed hin in the face. Defendant dropped his crutch, and Anthony picked it up and beat defendant until the crutch broke. Anthony thought defendant was trying to get the gun, which had fallen to the ground during the struggle, but John got to it first. John picked the gun up, placed the barrel against defendant's head, but he did not pull the trigger. He took the gun inside the house and placed it on the dining room table.

A patrol officer heard the gunshots and arrived at the scene within two minutes. He found defendant sitting in the middle if the lawn, bloodied but conscious. The paramedics arrived and transported Eddie to the hospital, where he died.

Officers who searched defendant's house after the shooting found more guns and ammunition. They also found a note, written on an old parking ticket, that said, "It might not be Ed, but Jay."

*B. The Defense Case*

As a result of the struggle that followed the shooting, defendant suffered a possible concussion, a fractured right wrist, an abraded and crushed little finger, and metacarpal fractures of his left hand. His toxicological screen was positive for methamphetamines, benzodiazepines, and opiates. Defendant also had a number of serious preexisting medical problems. He suffered from osteoarthritis and high blood pressure. A broken leg had healed improperly and had required corrective surgery in September 1999. Defendant had to use crutches until his leg healed and had prescriptions for his various ailments, including pain killers. He supplemented his Social Security disability income by selling drugs.

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 4 -

PDF created with pdfFactory trial version www.pdffactory.com

The jury learned more background information about defendant through the testimony of Dr. Charles Schaffer, a psychiatrist who testified concerning defendant's mental condition. In 1998, defendant was the victim of an aggressive home invasion robbery. Evidence suggested that a family member-----perhaps defendant's niece, Corina Fajardo-----and other people with whom defendant was acquainted were involved in the robbery. The intruders tied defendant up, gagged him, and beat him, taking money, drugs, and jewelry.

After the robbery, defendant's friends, neighbors, and relatives noticed that his behavior became increasingly bizarre. He seemed more paranoid, nervous, and vulnerable. Cindy Fajardo, defendant's half sister, lived with him for a time, but moved out when defendant accused her of being part of a conspiracy against him. Defendant's leg injury also seemed to increase his paranoia. Defendant went through a complete personality change; he was "tripping .... thinking the wrong thoughts." Defendant said his cat was acting strangely because it could hear people tunneling under the house. Defendant also believed people were trying to break into his house through the attic and were planting microphones. Defendant inquired from a salesperson named Pete Cabanyon about installing a home security system. One neighbor, Joaquin Miranda, saw defendant wearing a headset that defendant claimed could detect people in the backyard and the attic. The day before the shooting, Miranda heard defendant calling for help. Defendant said that he had been shot, but when Miranda examined him, he found no injuries.

Defendant made repeated 911 calls. He told officers that "someone was trying to put a satellite dish on top of his house so they could beam rays down from space and take over his body." The day before the shooting, he claimed he heard gunshots in the attic, but responding officers found nothing.

Defendant's paranoia often focused on Eddie Sanchez and sometimes on one of Eddie's coworkers, Jay Moffit. He accused Jay and Eddie of stealing from him. He thought there was a "Hispanic conspiracy against him" and that Eddie was "running it." He told people the harassment from Eddie was getting out of hand.

Prior to the shooting, defendant reported he had been "snorting a couple of lines" of methamphetamine every day for at least six months.

Dr. Charles Schaffer personally interviewed defendant, and reviewed statements of friends, relatives, and neighbors, as well as records from the county jail and reports of other mental health professionals, and concluded that at the time of the shooting defendant was suffering from an "amphetamine induced psychotic disorder, with delusions." Dr. Schaffer

PDF created with pdfFactory trial version www.pdffactory.com

noted that psychotic symptoms "can include delusions [or] thoughts that are out of touch with reality . . . . perceiving things that don't exist . . . seeing things that are not based on any real object . . . " Defendant denied experiencing any psychotic symptoms at the time of the interview with Dr. Schaffer. He claimed her could remember only bits and pieces of the confrontation with Eddie. He recalled clearly why he went to the Sanchez house. Hee needed a locksmith, and his auto club card was locked inside the house. He remembered asking Eddie about a weapon and recalled nothing else until he woke up in the University of California hospital.

Although Dr. Schaffer discounted defendant's claim of amnesia, he believed that his diagnosis of psychotic disorder with delusions was sound, based in part on the stories related to him by defendant's relatives and neighbors. He rejected----as highly improbable-----the possibility that defendant was malingering. He also opined, in support of defendant's claim of imperfect self-defense, that a person suffering from defendant's symptoms would have a heightened sensitivity to threat, especially when crowded by other people. Defense counsel sought to have all of the witnesses on whose statements Dr. Schaffer relied, including Joaquin Miranda, Pete Cabanyon, and Cindy Fajardo, testify during the trial. The court sustained the prosecutions objection that this evidence would be cumulative, but left the possibility the defense could present these witnesses if Dr. Schaffer failed to recall what they said.

The jury found the defendant guilty of the second degree murder of Eddie Sanchez (Pen. Code,§§ 187, subd. (a))n1 and the assault of Clarence Redoble (§§ 245. subd. (a)(2)). As to the murder charge, the jury found true an allegation that defendant personally used a firearm in violation of section 12022.53, subdivision (d). As to the assault charge, the jury found true an allegation that defendant personally used a firearm within the meaning of section 1203.06, subdivisions (a)(1), and section 12022.5, former subdivision (a)(1)(now subd.(a)). In a separate sanity phase of the trial, the jury found defendant was legally sane during the commission of the crimes.

*People v. Wright*, 35 Cal 4th 964, 966-971 (2005)(Wright I),

(Lodged Doc. Document 7 at 4-7). These facts were incorporated in

the second Court of Appeal decision on September 2, 2005. (Lodged

Doc. G at 2.)

**B.  Procedural History**

PDF created with pdfFactory trial version www.pdffactory.com

As indicated, after a jury trial in the Sacramento County, California Superior Court, the Petitioner was found guilty of second degree murder[1] and assault[2], both with a firearm.[3] [4] And, as noted, the jury found defendant was legally sane when the crimes were committed. (Lodged Document G at 1,4.) The trial court sentenced defendant to a total aggregate sentence of seven years plus 40 years to life. (Lodged Doc. G at 4.)

After trial, defendant appealed and the Third Appellate District reversed on August 4, 2003, holding imperfect self-defense may be predicated on delusions, and the trial court prejudicially erred in excluding as cumulative the direct testimony of witnesses who had observed defendant's bizarre behavior. (Lodged Doc. G at 4.) Thereafter the California Supreme Court (Wright I), on May 26, 2005, reversed the appellate court, concluding it did not need to address whether the doctrine of imperfect self-defense applied where the defendant's actual but unreasonable belief in the need to defend himself was based on delusions resulting from mental illness or voluntary intoxication, without any objective circumstances suggestive of a threat. The California Supreme Court said it did not need to decide the issue because defendant was able to claim imperfect self-defense, the jury heard evidence

---

[1]in violation of Ca. Penal Code, § 187, subd. (a)n1;

[2]in violation of Cal. Penal Code, § 245, subd. (a)(2);

[3]in violation of Cal. Penal Code § 120223.53, subd. (d);

Cal. Penal Code § 1203.06, subds. (a)(1);

[4]and section 12022.5, former subd. (a)(1) (now subd. (a)).

PDF created with pdfFactory trial version www.pdffactory.com

supporting that defense, and the trial court's exclusion of additional evidence supporting that defense was not prejudicial to defendant. (Lodged Doc. G at 4-5.)

On remand back to the Third Appellate District, the appellate court was directed to consider Mr. Wright's remaining contentions that the that the trial court prejudicially erred: (1) by refusing his two requested modifications to a jury instruction on imperfect self defense; (2) by excluding witnesses at the sanity phase of trial; (3) by giving an erroneous insanity instruction; and (4) by imposing a sentence which is cruel and unusual both on the face of the statute and as applied. (Lodged Doc. G at 5-15.) On September 2, 2005, the Third District Court of Appeal issued an unpublished opinion affirming Petitioner's conviction and sentence. (Lodged Document G at 16.) Petitioner then filed a petition for review (Lodged Document H) presenting the following eight issues to the California Supreme Court:

> (1) Does CALJIC No. 5.17, the instruction on imperfect self-defense, adequately explain the relevance of intoxication and delusions to an unreasonable belief in the need to defend oneself and was it prejudicial error for the trial court to refuse defendant's requested modification?

> (2) Is CALJIC No. 5.17, the instruction on imperfect self-defense, legally flawed because it fails to define "wrongful conduct," and was it prejudicial error for the trial court to refuse defendant's requested modification?

> (3) Is the Court of Appeal correct that the "unlawful or wrongful conduct" referred to in the last paragraph of CALJIC No. 5.17 includes *any unlawful conduct*, such as carrying a concealed weapon, whether or not that conduct directly created the circumstances which led to the defendant shooting the victim in an unreasonable belief in the need to protect himself from great bodily injury or death?

> (4) Did the Court of Appeal exceed its jurisdiction by making a factual finding that appellant engaged in unlawful conduct by carrying a concealed weapon without affording him

PDF created with pdfFactory trial version www.pdffactory.com

notice, right to jury trial or an opportunity to present a defense?

(5) Was it prejudicial error to exclude the witnesses' to defendant's bizarre behavior from testifying during the sanity phase, given that the defendant bears the burden of proof?

(6) Is CALJIC No. 4.02 a correct statement of the law of insanity?

(7) Under the federal and state constitutions, is Penal Code section 12022.53 cruel and/or unusual on its face?

(8) Under the federal and state constitutions, is the 40 years-to-life sentence imposed for second degree murder by using a gun within the meaning of Penal Code section 12022.53 cruel and/or unusual punishment, as applied to appellant?

(Lodged Document H at 1-2.)

The California Supreme Court denied Mr. Wright's second petition for review on December 21, 2005. (Lodged Document I.) On December 11, 2006, Mr. Wright filed his petition for writ of habeas corpus with this Court. (Ct. Recs. 1, 5.)

In his federal habeas petition, Mr. Wright raises seven allegations of trial and appellate court error:

(1) did the trial court err by precluding (during the guilt phase) lay witness testimony with respect to defendant's bizarre behavior prior to the shooting;

(2) did the trial court err by refusing to modify CALJIC No. 5.17 to explain how Mr. Wright's delusions could support voluntary manslaughter;

(3) did the trial court err by refusing to modify CALJIC 5.17 by failing to define "wrongful conduct";

(4) did the appellate court err by failing to reverse in order to give Mr. Wright notice, a trial, and a chance to

PDF created with pdfFactory trial version www.pdffactory.com

present a defense to the court of appeal's declaration that Mr. Wright committed "unlawful conduct" by carrying a concealed weapon;

(5) did the trial court err by excluding lay witness testimony (during the sanity phase) with respect to defendant's bizarre behavior prior to the shooting, given defendant's burden of proof;

(6) did the trial court err by sentencing under a statute which is cruel and/or unusual on its face; and

(7) did the trial court err by sentencing under a statute which is cruel and/or unusual as applied to Mr. Wright.
(Ct. Rec. 1 at 2.)

## II. EXHAUSTION OF STATE REMEDIES

As a preliminary issue, Petitioner must have exhausted his state remedies before seeking habeas review. The federal courts are not to grant a writ of habeas corpus brought by a person in state custody pursuant to a state court judgment unless 'the applicant has exhausted the remedies available in the courts of the State.' *Wooten v. Kirkland*, 540 F. 3d 1019, 1023 (9th Cir. 2008), citing 28 U.S.C. §2254(b)(1)(A). "This exhaustion requirement is 'grounded in principles of comity' as it gives states 'the first opportunity to address and correct alleged violations of state prisoner's federal rights.'" *Id.*, citing *Coleman v. Thompson*, 501 U.S. 722, 731 (1991).

In order to exhaust state remedies, a petitioner must have raised the claim in state court as a federal claim, not merely as a state law equivalent of that claim. See *Duncan v. Henry*, 513

PDF created with pdfFactory trial version www.pdffactory.com

U.S. 364, 365-66 (1995). The state's highest court must be alerted to and given the opportunity to correct specific alleged violations of its prisoners' federal rights. *Id.,* citing *Picard v. Connor*, 404 U.S. 270, 275 (1971). To properly exhaust a federal claim, the petitioner is required to have presented the claim to the state's highest court based on the same federal legal theory and the same factual basis as is subsequently asserted in federal court. *Hudson v. Rushen*, 686 F. 2d 826, 829-30 (9th Cir. 1982), *cert. denied*, 461 U. S. 916 (1983).

Respondent may waive the exhaustion requirement. *See* 28 U.S.C. § 2254 (b)(3) ("A state shall not be deemed to have waived the exhaustion requirement or be estopped from reliance on the requirement unless the state, through counsel, expressly waives the requirement.") In his answer to the petition, Respondent affirmatively alleged "Respondent admits that Petitioner has exhausted his stated grounds for relief to the extent interpreted by Respondent herein." (Ct. Rec. 12 at 2.) This clearly constitutes an express waiver by counsel of the exhaustion requirement. *See Dorsey v. Chapman*, 262 F. 3d 1181, 1187 at n. 8 (11th Cir. 2001). Generally, a habeas court may, in its discretion reach the merits of a habeas claim or may insist on exhaustion of state remedies despite a State's waiver of the defense. *See Boyd v. Thompson*, 147 F. 3d 1124, 1127 (9th Cir. 1998). The court's discretion should be exercised to further the interests of comity, federalism, and judicial efficiency. *See id.* It appears to advance the interests of the parties and judicial efficiency (without unduly offending the interests of either

PDF created with pdfFactory trial version www.pdffactory.com

comity or federalism) for the Court to decide these claims on the merits, as more fully discussed herein.

Respondent concedes that because Petitioner has properly exhausted his federal habeas claims, the federal court should consider the claims. Respondent argues the court should deny each claim on the merits. (Ct. Rec. 12 at 9-20).

Federal habeas claim one  Mr. Wright's first federal habeas claim is that the trial court "committed federal constitutional error during the guilt phase . . . when it precluded the jury from hearing from the witnesses who had experienced directly appellant's increasingly bizarre and paranoid behavior during the months preceding the killing." (Ct. Rec. 1 at 3.)  In his 2005 petition for review in the California Supreme Court, Mr. Wright presented a similar but not identical claim: "Was it prejudicial error to exclude the witnesses to defendant's bizarre behavior from testifying during the sanity phase, given that the defendant bears the burden of proof?"  (Lodged Doc. H at 2, at sub-number 5.)

In the federal petition, Petitioner contests the exclusion of defense witnesses Alkire, Waxman, Fajardo, Cabanyon, Miranda, and two police officers, during the **guilt** and sanity phases (federal claims 1 and 5, respectively).  In the state petition, he apparently refers to the same witnesses, but argues the error occurred solely by preventing their testimony during the **sanity** phase. (Ct. Rec. 1 at 3; Lodged Doc. H at 2.)  Mr. Wright's first federal habeas claim is new because he failed to allege error during the guilt phase in his state petition.  Because the claim

PDF created with pdfFactory trial version www.pdffactory.com

is new in the habeas petition, it has not been exhausted. *See* merits herein.

Federal habeas claim two  Mr. Wright claims the trial court erroneously refused to modify a jury instruction (CALJIC 5.17). Mr. Wright's federal petition alleges that the court erred by not including language explaining how "delusions could support the jury finding voluntary manslaughter based on unreasonable self-defense." (Ct. Rec. 1 at 3-4.) In the state's highest court, Mr. Wright similarly alleged the jury should have been told they could find voluntary manslaughter based on the relevance of mental disorder to unreasonable self-defense. (Lodged Doc. H at 6, state court claim one).  In his state petition Mr. Wright elaborated that the modification could enable the jury to consider "that malice aforethought was negated by appellant's mental disease, as exacerbated by the amphetamine-induced psychosis." (Lodged Doc. H at 5.)  Mr. Wright cited federal case law in support of this argument to the state's highest court. (Lodged Doc. H at 7.) Respondent is correct that Mr. Wright exhausted his second federal habeas claim.  *See* merits herein.

Federal habeas claim three  Mr. Wright's third federal habeas claim is that the trial court erred by failing define "wrongful conduct" in its imperfect self-defense instruction (CALJIC No. 5.17).  (Ct. Rec. 1 at 4.) Mr. Wright raised the same issue in the state supreme court (as claim 2) and cited supporting federal case law. (Lodged Doc. H at 8, 12, 14-15.)  Respondent is correct that Mr. Wright exhausted his third federal habeas claim.

Federal habeas claim four  Mr. Wright's fourth federal habeas

PDF created with pdfFactory trial version www.pdffactory.com

1  claim is that the Court of Appeal erred with respect to the same
2  instruction (CALJIC No. 5.17) by declaring Mr. Wright committed
3  "unlawful conduct" by carrying a concealed weapon - thereby
4  depriving him "of his rights to notice, jury trial and the
5  opportunity to present a defense to the allegation when the
6  prosecutor did not even argue that theory to [Mr. Wright's] jury."
7  (Ct. Rec. at 8.)  Mr. Wright raised the argument in the state's
8  highest court in the same way (also as state claim four), and
9  relied on supporting federal constitutional and case law
10 authority.  (Lodged Doc. H at 16.)  Mr. Wright has exhausted his
11 fourth federal claim.

12     Federal habeas claim five  Mr. Wright's fifth federal habeas
13 claim is that the trial court erred by excluding, during the
14 sanity phase, testimony by lay witnesses who would describe
15 "defendant's bizarre behavior."  Mr. Wrights points out that the
16 defendant has the burden of proving the insanity defense by a
17 preponderance of the evidence.  He notes the trial court excluded
18 the evidence as cumulative.  With respect to his fifth federal
19 habeas claim, Petitioner cites as support the Sixth and Fourteenth
20 Amendments to the federal constitution; he did not, however, cite
21 theses provisions, or other federal law, in support of the same
22 claim (also claim 5) in the state petition.  (*Cf* Ct. Rec. 1 at 3
23 *with* Lodged Doc. H at 17-21.)](Ct. Rec. 1 at 9.)  Mr. Wright
24 failed to present a claim based on federal law to the state court
25 as required. This claim is presumptively unexhausted.

26     Federal habeas claim six  Mr. Wright claims he was sentenced
27 under a statute which, on its face, is cruel and/or unusual in

28

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 14 -

PDF created with pdfFactory trial version www.pdffactory.com

violation of the Eighth Amendment. (Ct. Rec. 1 at 11.) In his state petition, Mr. Wright made the same argument and sought relief based on federal law. (Lodged Doc. H at 24-25, state claim 7.) Respondent is correct that Mr. Wright has exhausted federal claim six.

Federal habeas claim seven Mr. Wright claims his sentence is cruel and/or unusual, as applied, in violation of the Eighth amendment to the U.S. Const. (Ct. Rec. 1 at 12.) In his state petition, he raised the same claim (state claim 8) and invoked the same federal protections. (Ct. Rec. 1 at 24.) This claim too is exhausted.

In sum, Mr. Wright has exhausted federal claims two, three, four, six and seven. Claims one and five are presumptively unexhausted.

Mixed petitions

Prior to enacting AEDPA, *Lundy* held that federal district courts may not adjudicate mixed petitions for habeas corpus, that is, petitions containing both exhausted and unexhausted claims. *Rhines v. Weber*, 544 U.S. 269, 273-274 (2005), citing *Rose v. Lundy*, 455 U.S. 509 (1982). In 1996, AEDPA added a one-year statute of limitations on filing federal habeas petitions. 28 U.S.C. § 2244(d). As a result of the interplay between AEDPA's 1-year statute of limitations and *Lundy's* dismissal requirement, petitioners who come to federal court with "mixed" petitions run the risk of forever losing their opportunity for any federal review of their unexhausted claims. *Rhines,* 544 U.S. at 274-275. Accordingly, courts have adopted a

PDF created with pdfFactory trial version www.pdffactory.com

"stay and abeyance" procedure where, rather than dismiss the mixed petition pursuant to *Lundy*, a district court might stay the petition and hold it in abeyance while the petitioner returns to state court to his exhaust his previously unexhausted claims. Once the state remedies are exhausted, the district court lifts the stay and allows the petition to proceed in federal court. *Rhines,* 544 U.S. at 275-276.

A district court is permitted to stay a mixed petition -- a petition containing both exhausted and unexhausted claims -- in "limited circumstances," so that a petitioner may present his unexhausted claims to the state court without losing his right to federal habeas review due to the relevant one-year statute of limitations. *Wooten,* 540 F. 3d at 1023, citing *Rhines,* 544 U.S. at 273-275, 277-278 (2005). In *Rhines,* the U.S. Supreme Court stated that "stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Id.,* citing *Rhines*, 544 U.S. at 277. Under *Rhines*, a district court must stay a mixed petition only if: (1) the petitioner has "good cause" for his failure to exhaust his claims in state court; (2) the unexhausted claims are potentially meritorious; and (3) there is no indication that the petitioner intentionally engaged in dilatory litigation tactics. *Wooten*, 540 F. 3d at 1023, citing *Rhines*, 544 U.S. at 278. The *Wooten* court continued:

> Wooten argues that he was entitled to a stay under
> *Rhines* so that he could exhaust his cumulative error
> claim. We hold that the district court did not abuse
> its discretion in concluding that Wooten did not have
> 'good cause' for failing to exhaust his cumulative error
> claim. As a result, we need not reach the other two

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 16 -

PDF created with pdfFactory trial version www.pdffactory.com

1    factors in the *Rhines* test.
2  *Wooten*, 540 F. 3d at 1023

3      Like Mr. Wooten, Mr. Wright has not shown good cause for
4  failing to exhaust his first and fifth claims.  Accordingly, it is
5  not appropriate for the court to stay his first and fifth claims
6  pending exhaustion in state court.

7  **III. PROCEDURAL DEFAULT**

8      As noted, Petitioner has exhausted federal habeas claims
9  2,3,4,6 and 7.  With respect to federal claim four, the
10 "procedural default doctrine 'bar[s] federal habeas [review] when
11 a state court declined to address a prisoner's federal claims
12 because the prisoner had failed to meet a state procedural
13 requirement.'"  *Calderon v. United States District Court*, 96 F. 3d
14 1126, 1129 (9th Cir. 1996)(quoting *Coleman v. Thompson*, 501 U.S.
15 722, 729-30 (1991).  This doctrine applies when: (1) a state court
16 has been presented with a federal claim, but declined to reach the
17 issue pursuant to an independent and adequate state procedural
18 rule, or when (2) it is clear that the state court would hold the
19 claim procedurally barred.  *Harris v. Reed*, 489 U.S. 255, 260-263
20 (1989).  This Court may not reach the merits of procedurally
21 defaulted claims, that is, claims "in which the petition failed to
22 follow applicable state procedural rules in raising the claims"[.]
23 *Sawyer v. Whitley*, 505 U.S. 333, 338 (1992), citing *Murray v.*
24 *Carrier*, 77 U.S. 478 (1986).

25     The California Supreme Court and case law procedurally bar
26 the California Supreme Court from considering an issue not raised

27

28
   REPORT AND RECOMMENDATION TO DENY
   WRIT OF HABEAS CORPUS
   - 17 -

PDF created with pdfFactory trial version www.pdffactory.com

in the Court of Appeal.  *See* Cal. Rule of Court 8.500(c)(1)[5]; *In re Harris*, 5 Cal 4th 813, 824 (1993) (acknowledging the court's analysis also applies to the so-called "*Dixon* rule," which generally prohibits raising an issue in a postappeal habeas corpus petition when that issue was not, but could have been, raised on appeal). *Harris*, 5 Cal 4th at 824, referring to *In re Dixon* (1953) 41 Cal.2d 756.

On review of a habeas petition the court asks whether Rule 8.500(c)(1) and the so-called *Dixon* rule comprise an independent and adequate state procedural ground barring habeas relief.

In order for a state procedural rule to bar a federal claim, the state rule must be independent of federal law, *see Park v. California*, 202 F. 3d 1146, 1151-1152 (9th Cir. 2000), firmly established at the time of the default, *see Ford v. Georgia*, 498 U.S. 411, 412 (1991), and regularly applied by the state. *See Johnson v. Mississippi*, 486 U. S. 578, 579 (1988).  In the present case, the *Dixon* rule generally prohibiting  raising an issue in a postappeal habeas corpus petition when that issue was not, but could have been, raised on appeal, is settled law in California. *See In re Harris,* 5 Cal.4th 813, 824 at n3 (1993); *People v. Sumstine*, 36 Cal.3d 909, 920 (1984); *In re Dixon*, 41 Cal.2d 756, 759 (1953).

Procedural default is excused if "the prisoner can demonstrate cause for the default and actual prejudice as a result

---

[5] As a policy matter, on petition for review the Supreme Court normally will not consider an issue that the petitioner failed to timely raise in the Court of Appeal. Cal. Rules of Court, Rule 8.500(c)(1).

PDF created with pdfFactory trial version www.pdffactory.com

of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Cause "must be something external to the petitioner, something that cannot fairly be attributed to him." *Id.* at 753 (internal citation omitted). A "fundamental miscarriage of justice" occurs when "a constitutional violation has probably resulted in the conviction of one who is actually innocent[.]" *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).

Petitioner does not attempt to prove cause and prejudice, or make a colorable showing of actual innocence sufficient to excuse his default with respect to his failure to raise the same federal claim (claim four) to the state's highest court. An independent review of the record does not show that "cause and prejudice" are established for purposes of excusing the procedural default. Nor does the record reveal a colorable showing of actual innocence sufficient to excuse Petitioner's procedural default. However, because the California Supreme Court issued a "postcard" order of summary denial, this court cannot look through to ascertain that the claim was denied pursuant to this state bar. Accordingly, the habeas court can consider the merits of federal habeas claim four despite probable procedural default.

Mr. Wright failed to properly exhaust his first and fifth habeas claims. And he fails to establish any of the applicable exceptions for the failure. However, a brief review of the merits indicates the claims should be denied as Mr. Wright fails to meet his burden as a habeas petitioner.

PDF created with pdfFactory trial version www.pdffactory.com

**IV. MERITS**

**A.  Standard of Review**

     Under the Anti-Terrorism and Effective Death Penalty Act
(AEDPA), applicable here, a federal court may grant habeas relief
if a state court adjudication resulted in a decision that was
contrary to, or involved an unreasonable application of clearly
established federal law, as determined by the Supreme Court of the
United States, or resulted in a decision that was based upon an
unreasonable determination of the facts in light of the evidence.
28 U.S.C. § 2254 (d).  "AEDPA does not require a federal habeas
court to adopt any one methodology in deciding the only question
that matters under § 2254(d)(1) - whether a state court decision
is contrary to, or involved an unreasonable application of,
clearly established federal law." *Lockyer v. Andrade*, 538 U.S.
63, 71 (2003), referring to  *Weeks v. Angelone*, 528 U.S. 225 at
237 (2000).  Where no decision of the Supreme Court "squarely
addresses" an issue or provides a "categorical answer" to the
question before the state court, § 2254(d)(1) bars relief.  *Moses
v. Payne*, 543 F. 3d 1090, 1098 (9th Cir. 2008), relying on *Wright
v. Van Patten*, __ U.S. __, 128 S. Ct. 743, 746 (2008); *Carey v.
Musladin*, 549 U.S. 70 (2006).

     Federal courts apply the *Brecht* standard to determine whether
a constitutional error was harmless.  *Fry v. Pliler,* 551 U.S. 112
(2000); *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).  Habeas
relief is warranted only if the error had a "substantial and
injurious effect or influence in determining the jury's verdict."
*Brecht,* 507 U.S. at 637 ((citing *Kotteakos v. United States,* 328

PDF created with pdfFactory trial version www.pdffactory.com

U.S. 750, 776 (1946)); *Bains v. Cambra*, 204 F. 3d 964, 977-78 (9th Cir.) *cert. denied*, 531 U.S. 1037 (2000)). That is, the Petitioner is entitled to habeas relief only if he can show that any constitutional violation "resulted in actual prejudice." *Brecht,* 507 U.S. at 638 (internal citation omitted).

///

///

**B. Federal Claims One and Five: Exclusion of witnesses during guilt and sanity phases of trial**

The Petitioner's first federal claim is that the trial court erred by refusing to permit several defense witnesses to testify during the guilt phase of his trial. (Ct. Rec. 1 at 3.) As noted, Mr. Wright did not make this argument in the state's highest court, although he argued that the court erred by excluding these witnesses during the sanity phase of his trial. (Lodged Doc. H at 1-2, state court claim 5.) The California Supreme Court analyzed the alleged error of excluding the

witnesses during the sanity phase (state and federal claim five) as follows:

> . . . Assuming without deciding that imperfect self-defense applies here, we see no prejudice to defendant in the trial court's ruling that excluded the testimony of his witnesses.
>
> The jury was instructed on the doctrine of imperfect self-defense, and defense counsel was permitted to argue this theory. Moreover, evidentiary support for defendant's imperfect self defense claim was provided by the testimony of prosecution witness Clarence Redoble and Anthony Sanchez, as well as defense expert Dr. Schaffer. Redoble, for example, described in detail defendant's paranoid behavior prior to the shooting, including his belief that he was the target of a possible attack and that people were trying to enter his house. The Court of Appeal reversed solely because the trial court excluded as cumulative the testimony of other witnesses

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 21 -

PDF created with pdfFactory trial version www.pdffactory.com

who would have recounted additional instances reflecting defendant's precarious mental state in the days, weeks, and months preceding the shooting. According to the defense offer of proof, these witnesses would have testified to the circumstances of the home-invasion robbery, how defendant's behavior deteriorated after the robbery, what defendant told police officers who responded to his 911 calls, and how defendant was acting on the day before the shooting.

The substance of this excluded testimony was, however, admitted through Dr. Schaffer, the defense expert who relied on statements from these various witnesses in forming his opinion about defendant's mental state and who described these statements to the jury. The trial court admitted his descriptions without a limiting instruction, and defense counsel elicited details from Dr. Schaffer without a single objection from the prosecution. In addition, the trial court, as already noted, permitted the defense to renew its request to present these witnesses if Dr. Schaffer's testimony was inadequate, and defense counsel chose not to do so, suggesting satisfaction with Dr. Schaffer's testimony.

Thus, the jury heard Dr. Schaffer recount the statement of defendant's uncle that after the home-invasion robbery defendant "became very vulnerable" and was concerned that someone was trying to burglarize his house, that defendant also believed someone was surveilling the house and monitoring his conversations with hidden microphones, and that, on the day before the shooting, defendant was "really strange," "agitated and disturbed," "shaking," and "looked bad," and made his uncle afraid. Dr. Schaffer also recounted the statement of the uncle's grandson that, on the day before the shooting, defendant was "acting weird" and talking about strange things, such as people entering his home and planting microphones, hearing voices in the attic, seeing people crawling under the house, and cars chasing him. Dr. Schaffer further recounted the statement of defendant's half sister who lived with defendant for several months. She reported that defendant became "very afraid right after his home invasion robbery," that he repeatedly woke her up in the middle of the night because he believed someone was in his house, that he believed someone had "bugged" the house and was out to "get" him, and that he had accused her of being part of a conspiracy against him, and that she believed his leg injury had exacerbated his paranoia. In addition, Dr. Schaffer recounted the statement of the home security system salesperson who visited defendant in September or October 1999 and reported that defendant was terrified and shaking and believed people had "bugged" his house, were trying to enter the house, and "were out to get him." Dr. Schaffer also recounted the statement of the neighbor who reported that defendant became increasingly paranoid about six months before the shooting, claimed people

PDF created with pdfFactory trial version www.pdffactory.com

were stealing from him and trying to kill him, asserted that
his head set could detect intruders, and falsely declared on
the day before the shooting that he had been shot in the
back. Finally, Dr. Schaffer described the 911 call on the day
before the shooting, in which defendant claimed that there
were intruders in the house, that he had heard gunshots in
the attic and the crawlspace under the house, and that
someone was trying to install a satellite dish on his roof.
Dr. Schaffer described the conclusion of the police officer
who responded to the call and found no basis for defendant's
concerns. In short, through Dr. Schaffer's testimony, the
jury heard the substance of what all these witnesses had to
say. We certainly do not condone the use of hearsay to
present a case to the jury, but the primary consequence of
the trial court's ruling excluding the testimony of these
several witnesses was that the jury did not see the witnesses
testify live.

The Court of Appeal found the trial court's ruling
prejudicial error. In the court's words, "this is the rare
case in which the trial court abused its discretion," because
defendant's mental state "was the lynchpin of his defense"
and the excluded testimony "was crucial to the defense's
position that defendant's delusional mental state was not
falsely fabricated after he committed the
crime." Under these circumstances, the Court of Appeal
reasoned, defendant was deprived of his state and federal
constitutional rights to due process of law.

The Court of Appeal's analysis cannot withstand scrutiny.
Not only did the jury learn the substance of the excluded
testimony, but the People never challenged the accuracy of
the witnesses' statements or Dr. Schaffer's description of
those statements, and therefore the credibility of these
witnesses was simply not a central issue. In fact, after the
defense made its offer of proof regarding these witnesses,
the district attorney explained to the court:
"I am not contesting that the statements he read are true. I
mean, if the witnesses come in, I wouldn't intend on
suggesting in any way that they are making this stuff up."
Moreover, in closing argument to the jury, the district
attorney referred to Dr. Schaffer's testimony and said: "[I]f
the psychotic disorder is true that the psychiatrist  was
telling you about, that he actually has some real delusions,
*and it sounds like that's true. He's having some real
delusions the week before and up to this very day*. These real
delusions probably have an impact on him, right? That's no
problem with that. Everybody can buy that. *I think we can all
be on the same page that this is going on . . .*"(Italics
added..)  The district attorney's strategy, in other words,
was to concede the existence of defendant's mental problems
but argue there was no evidence that defendant actually
believed an imminent peril necessitated the use of deadly
force at the moment the shooting occurred. (See *Christian S.,*

PDF created with pdfFactory trial version www.pdffactory.com

*supra*, 7 Cal.4th at p. 783, 30 Cal.Rptr.2d 33, 872 P.2d 574.)
As the district attorney put it: "These are issues that show
that he has moments certainly of lucidity and clarity. And
when he's over there at the house we don't know what happened
for sure. We don't know what's in his head. .. Where's the
evidence? Where's the evidence in his head that at that
moment he said, oh my gosh, I know I have an [actual]
unreasonable belief in the need to defend myself against this
imminent peril right now. I've got to do it, boom. You know
what, there's no evidence of that." Thus, defendant's actual
belief *at the time of the shooting* was the critical issue in
the case, not the general existence of his abnormal mental
condition, and testimony of live witnesses who would have
described defendant's general state of mind at various times
*prior to* the shooting would not have affected the jury's
assessment of that critical issue in any way, because (1) the
jury learned the substance of this testimony through Dr.
Schaffer, and (2) the prosecution conceded the truth of the
statements recounted by Dr. Schaffer, as well as Dr.
Schaffer's diagnosis of psychotic delusions.

The Court of Appeal, relying in part on *Crane v. Kentucky*,
(1986) 476 U.S. 683, concluded that exclusion of this
testimony was so serious an error that it violated
defendant's right to a fair trial under the federal
Constitution, and defendant, also relying on *Crane*, argues
that the trial court's ruling prevented the jury from
assessing the credibility of his defense. In *Crane*, the
credibility of the defendant's confession was the central
issue in the case, and the high court held that the trial
court in that case erred in excluding evidence related to
the circumstances of the confession, because that evidence
bore on the question of credibility. (*Id.*, at pp. 690-691.)
Here, on the other hand, the People did not contest the
accuracy of Dr. Schaffer's hearsay account of defendant's
delusional behavior, and in fact the people conceded that
defendant was having the delusions that the excluded
witnesses would have described.  Therefore, contrary to
defendant's assertion, the exclusion of their testimony did
not impact the credibility of his defense as directly as the
exclusion of evidence that was at issue in *Crane*.

Because the circumstances at the time of the shooting only
weakly support the conclusion that defendant was acting at
that time under a delusional belief that he was under attack
(cf. *People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1263,
115 Cal.Rptr.2d 229), the evidence of other paranoid
delusions was of some importance - but the jury heard about
this paranoid and delusional behavior from defendant's friend
Clarence Redoble. The trial court's decision to bar
additional testimony to the same effect (but to allow Dr.
Schaffer to describe the substance of this excluded evidence)
arguably did not violate Evidence Code section 352, but we
need not decide the question. Even if we assume the trial

PDF created with pdfFactory trial version www.pdffactory.com

court erred, and if we assume the error was so grave as to implicate defendant's federal due process rights, the exclusion of this evidence was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

*Wright I*, at 6-8 (emphasis original).

It is well settled under the Sixth Amendment that an accused has the right to present witnesses, testimony and other evidence in his defense. The accused does not, however, have au unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. *Taylor v. Illinois*, 484 U.S. 400, 409-410 (1988). States are given considerable latitude under the Constitution to establish rules excluding evidence from criminal trials. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). This right is abridged, however, by rules of evidence that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes the rules are designed to serve. *Id*. "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate." *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005)(citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996)(holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion). In considering whether the exclusion of evidence violates due process, this court must consider the probative value of the evidence on the central issue. *United States v. Cruz-Escoto*, 476 F.3d 1081, 1088 (9th Cir. 2007).

Finally, assuming exclusion was error, it is subject to harmless-error analysis. *Neder v. United States*, 527 U.S. 1 (1999).

The undersigned agrees with the state courts that any error in excluding this cumulative testimony was harmless beyond a reasonable doubt.

As to claims one and five, Petitioner does not show the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence. *See e.g., Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003). Mr. Wright cites no decision by the U.S. Supreme Court contrary to the California Supreme Court's decision which could provide a basis for federal habeas relief.

The record supports the analysis by the California Supreme Court, that any error in this context during the sanity phase was harmless beyond a reasonable doubt, because the testimony was clearly cumulative: the same testimony came in through Dr. Schaffer, the prosecutor did not object to his testimony, the court gave no limiting instruction with respect to his testimony, and the witnesses' credibility was not a central issue. The same reasoning is applicable to the new claim of error during the guilt phase. Because Mr. Wright fails to show that the trial court's ruling was more than harmless error beyond a reasonable doubt, or contrary to established federal law, his first and fifth claims should be denied.

## C. Habeas Claim Two: Instructional error - "delusions"

The Petitioner claims that the court should have modified the

PDF created with pdfFactory trial version www.pdffactory.com

self-defense instruction "to explain how Mr. Wright's delusions could support the jury finding voluntary manslaughter based on unreasonable self-defense." (Ct. Rec. 1 at 3-4). The trial court gave the following instruction:

> A person who kills another person in the actual but unreasonable belief in the necessity to defend himself against imminent peril to life or great bodily injury, kills unlawfully, but harbors neither express nor implied malice and is not guilty of murder.
>
> This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief.
>
> Such an actual but unreasonable belief is not a defense to the crime of voluntary or involuntary manslaughter.
>
> As used in this instruction, imminent peril or danger means one that is apparent, present, immediate, and must be instantly dealt with or must so appear at the time to the slayer.
>
> However, this principle is not available, and malice aforethought is not negated if the defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force, attack, or pursuit.

Lodged Doc. G at 5, CALJIC No. 5.17.

> Defendant proposed adding:
>
> There need not be a reasonable basis for the defendant's belief in the necessity to defend. That belief may be the product of [intoxication], [delusion] [or] [simple mistaken perception].

Lodged Doc. G at 5.

Respondent notes Mr. Wright sought the addition to clarify the defense theory that his honest but unreasonable belief in the need for self-defense was based, in part, on delusions. (Ct. Rec. 12 at 14-15.) Respondent answers that the correctness of a jury instruction under state law does not raise a federal question. (Ct. Rec. 12 at 15), citing *Estelle v. McGuire,* 50

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 27 -

PDF created with pdfFactory trial version www.pdffactory.com

1  U.S. 62, 71-72 (1991).

2       With respect to this argument, the last reasoned state

3  court decision opined:

4       The instructions did not limit the term "unreasonable."
       Defendant does not claim the prosecutor argued to the jury
5       that "unreasonable belief" excluded delusions. We see no
       reason why the jury would think "unreasonable belief"
6       excluded delusions.

7       . . . [t]he prosecutor argued the evidence showed the
       unreasonable belief that prompted the shooting was not a need
8       to self-defend, but a belief that Sanchez had to be
       eliminated because he was part of some conspiracy of people
9       following and spying on defendant.

10  (Lodged Doc. G at 5,8.)

11       The standard for granting habeas relief on the basis of an

12  improper jury instruction is whether the challenged instruction "

13  so infected the entire trial that the resulting conviction

14  violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72

15  (1991), quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). A

16  challenged instruction violates the federal constitution if there

17  is a "reasonable likelihood that the jury has applied the

18  challenged instruction in a way that prevents the consideration of

19  constitutionally relevant evidence." *Boyde v. California*, 494 U.S.

20  370, 380 (1990). The question is whether the instruction, when

21  read in the context of the jury charges as a whole, are

22  sufficiently erroneous to violate the Fourteenth Amendment."

23  *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must

24  also assume in the absence of evidence to the contrary that the

25  jury followed those instructions. *See Weeks v. Angelone*, 528 U.S.

26  225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206

27  (9187)(noting the "almost invariable assumption of the law that

28
       REPORT AND RECOMMENDATION TO DENY
       WRIT OF HABEAS CORPUS
       - 28 -

PDF created with pdfFactory trial version www.pdffactory.com

jurors follow their instructions"); *Francis*, 471 U.S. at 324 n. 9 (1985).

It is well established that not only must the challenged instruction be erroneous but it must violate some constitutional right and may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution; and, the category of infractions that violate "fundamental fairness" is very narrow. *Id.*, 502 U.S. at 72-73.

If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law. *See Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004).

Mr. Wright's argument is foreclosed by the decision of the Ninth Circuit in *Menendez v. Terhune*, 422 F.3d 1012 (2005), that CALJIC 5.17 is an accurate statement of California law with respect to imperfect self-defense; citing CALJIC 5.17; *In re Christian S.*, 7 Cal 4th 768, 771 (1994).

State courts "are the ultimate expositors of state law," and federal courts are bound by their constructions except in "extreme circumstances," such as where a state court's interpretation of state law appears to be an "obvious subterfuge to evade

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 29 -

PDF created with pdfFactory trial version www.pdffactory.com

consideration of a federal issue." *Mullaney v. Wilbur*, 421 U. S. 684, 691 (1975). There was no "obvious subterfuge" here. It is for the California court to determine the scope of imperfect self-defense and the circumstances where malice aforethought is deemed to be present or negated. See *Stanton v. Benzler*, 146 F.3d 726, 727 (9th Cir. 1998)(explaining that a state is generally free within broad limits to define the elements of a particular offense).

And, as the Court of Appeal observed, any error is harmless. (Lodged Doc. G at 8).

Federal claim two should be dismissed on the merits.

**D. Habeas Claim Three: Instructional error - "wrongful conduct"**

Mr. Wright's third federal claim is that trial court erred when it gave the imperfect self-defense jury instruction (CALJIC 5.17) because the court failed to define "wrongful conduct." (Ct. Rec. 1 at 4-8). He proposed the court instruct the jury that wrongful conduct meant "the initiation of physical assault or commission of a felony." As the Court of Appeal pointed out:

> The prosecutor argued wrongful conduct is not so limited and includes refusing to leave someone's home. The trial court denied the proposed modification.
>
> The prosecutor argued to the jury: "Well, now you get to the last paragraph [of CALJIC No. 5.17] which is really the key to this instruction, and it tells you, this principle, however, is not available, and malice aforethought is not negated if the defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force, attack, or pursuit." Defense counsel objected for the record and was overruled. The prosecutor argued defendant's wrongful conduct was (1) going to the Sanchez home with a gun, (2) refusing to leave the Sanchez home, (3) being there, (4) pulling the gun out, (5) pulling the trigger. After a recess, the prosecutor argued, "you shouldn't be able to take some meth or cocaine or some other narcotic that

PDF created with pdfFactory trial version www.pdffactory.com

might take you up, step you up yet another notch when – and then you go out and create a situation, one of rage or anger or whatever it is, and then say, well, I have an unreasonable belief[,] if you create the situation . . . " The prosecutor argued the evidence showed the unreasonable belief that prompted the shooting was not a need to self-defend, but a belief that Sanchez had to be eliminated because he was part of some conspiracy of people following and spying on defendant.

    . . .

Defendant argues the last paragraph of CALJIC No. 5.17 was probably designed to, but failed to, convey the principle that self-defense is not available to an aggressor. He argues "wrongful conduct" has a special meaning (forcible or felonious conduct) that must be defined for the jury.

However, we need not address defendant's argument, because any error was harmless under *Watson* standard invoked by defendant. Thus, the instruction (fn. 3, ante) is not limited to "wrongful conduct," but refers to "*unlawful* or wrongful conduct." (Italics added.) Carrying a concealed weapon, as defendant did in this case, is unlawful. (§ 12025.) Eddie Sanchez suspected the bulge in defendant's jacket was a gun and patted the jacket, which arguably cause defendant to shoot (though defense counsel argued to the jury that Eddie Sanchez did not do *anything* that would constitute force, attack, or pursuit under CALJIC No. 5.17.

Neither side address this point. Although the prosecutor did not expressly argue to the jury the unlawfulness of carrying the gun, he did talk about the gun and presumably would have argued unlawfulness of the gun had the trial court foreclosed the wrongful conduct argument.

We conclude there was no reversible error regarding CALJIC No. 5.17.

(Lodged Doc. G at 8-9).

    Federal claim three of instructional error by giving CALJIC 5.17 and failing to define "wrongful conduct" fails for the same reasons as federal claim two. Most importantly for habeas review, the state court's denial of Mr. Wright's claimed instructional error (also state claim three) was not contrary to or an unreasonable application of clearly established federal law. The third federal claim is therefore without merit.

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 31 -

PDF created with pdfFactory trial version www.pdffactory.com

///

**E. Habeas Claim Four: Court of Appeal erred by failing to order notice, trial and ability to conduct defense with respect to "**

PDF created with pdfFactory trial version www.pdffactory.com

As noted, the instruction refers to "unlawful or wrongful conduct." (Lodged Doc. G at 8.) Respondent observes the state court ruled that any error was harmless because even if the trial court had given the proposed instruction regarding "wrongful conduct," the evidence was undisputed that Petitioner engaged in unlawful conduct by carrying a concealed weapon, and for that reason also was not entitled imperfect self-defense. (Ct. Rec. 12 at 17.) The undersigned agrees.

The claimed lack of notice of "unlawful conduct" was raised initially in the Petition for Review filed in the California

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 33 -

PDF created with pdfFactory trial version www.pdffactory.com

1  Supreme Court, therefore arguably barred by procedural default
2  since the Court of Appeal was not given the first opportunity of
3  review. In any event, the undersigned agreed with Respondent that
4  the California Supreme Court's denial of this claim was "neither
5  contrary to nor an unreasonable application of clearly established
6  precedent," and error if any was indeed harmless.
7  Federal claim four should be dismissed because it is without
8  merit.

9  **F.  Habeas Claim Five: Error in excluding defense witnesses during**
   **sanity phase**
10       This claim is analyzed *infra* with Claim one.
11 **G.  Habeas Claims Six and Seven: Sentencing in violation of the**
12     **Eighth Amendment, facially and as applied**
13       Mr. Wright alleges the 25-years-to-life sentence enhancement
14 for using a firearm, and the aggregate 40-years-to-life sentence
15 for the murder and the enhancement each constitute cruel and
16 unusual punishment.  (Ct. Rec. 1 at 11-13.)
17       Mr. Wright does not make out a claim under the Eighth
18 Amendment, either facially or as applied.  The Court of Appeal
19 analyzed and rejected these claims:

20       The Eighth Amendment to the United Stated Constitution (which
       says "cruel and unusual punishments [shall not be]
21       inflicted") applies to the states via the Fourteenth
       Amendment and contains a narrow proportionality principle
22       that applies to noncapital sentences. *People v. Carmony*, 127
       Cal.App.4th 1066, 1075 (2005).
23       . . .
24
       Thus, under both the federal and state Constitutions, the
25       criteria are (I) the gravity of the offense and the harshness
       of the penalty; (ii) the sentence imposed on other criminals
26       in the same jurisdiction; and (iii) the sentences imposed for
       commission of the same crime in other jurisdictions.
27       . . .
28

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 34 -

PDF created with pdfFactory trial version www.pdffactory.com

Since defendant fails to show the sentence of 40 years-to-life was grossly disproportionate for shooting a man to death, we need not address his comparisons with other offenses in California or with similar offenses in other states.

. . .

Defendant fails to show this case presents that "exquisite rarity" of an instance of punishment that offends fundamental notions of human dignity or shocks the conscience. *People v. Weddle*, 1 Cal. App.4th 1190, 1196 (1991). . .

Defendant fails to show his sentence violates federal or state constitutional prohibitions regarding cruel and/or unusual punishment.

(Ct. Rec. G at 12-15.)

The undersigned agrees. Mr. Wright has not shown that his sentence as applied is cruel or unusual in violation of the protections afforded by the Eight Amendment, nor that the sentence enhancement statute facially violates the Eighth Amendment.

Accordingly, claims six and seven should be dismissed as they are without merit.

**V. CONCLUSION**

For the reasons stated above, **IT IS RECOMMENDED** the Petition for Writ of Habeas Corpus (Ct. Rec. 1) be **DENIED**.

**OBJECTIONS**

Any party may object to the magistrate judge's proposed findings, recommendations or report within ten (10) days following service with a copy thereof.  Such party shall file with the Clerk of the Court all written objections, specifically identifying the portions to which objection is being made, and the basis therefor.  Attention is directed to Fed. R. Civ. P. 6(e), which adds another three (3) days from the date of mailing if service is by mail.  A district judge will make a de novo determination of those portions

PDF created with pdfFactory trial version www.pdffactory.com

to which objection ids made and may accept, reject, or modify the magistrate judge's determination. The district judge need not conduct a new hearing or hear arguments and may consider the magistrate judge's record and make an independent determination thereon. The district judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. See 28 U.S.C. § 636 (b) (1) (C) , Fed. R. Civ. P. 73, and LMR 4, Local Rules for the Eastern District of Washington. A magistrate judge's recommendation cannot be appealed to a court of appeals; only the district judge's order or judgment can be appealed.

The District Court Executive **SHALL FILE** this report and recommendation and serve copies of it on the referring judge and the parties.

**DATED** this 13th day of May, 2009.

        s/James P. Hutton

        JAMES P. HUTTON
        UNITED STATES MAGISTRATE JUDGE

REPORT AND RECOMMENDATION TO DENY
WRIT OF HABEAS CORPUS
- 36 -

PDF created with pdfFactory trial version www.pdffactory.com